**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------X
ROBERT KEMP, Individually and :
On Behalf of All Others        :
Similarly Situated,            :
                               :
              Plaintiff,       :
                               :       05 Civ. 9883 (JFK)
                               :        (Consolidated)
         -against-            :       **OPINION & ORDER**
                               :
UNIVERSAL AMERICAN FINANCIAL   :
CORP.; ROBERT A. BARASCH;      :
ROBERT A. WAEGELEIN; and       :
GARY W. BRYANT,                :
                               :
              Defendants.      :
------------------------------:


APPEARANCES:

          For Plaintiffs:
               Samuel H. Rudman
               David A. Rosenfeld
               Mark S. Reich
               Lerach Coughlin
               58 South Service Road, Suite 200
               Melville, NY 11747

          For Defendants:
               Andrew J. Levander
               Joseph F. Donley
               Shalom Doron
               Dechert LLP
               30 Rockefeller Plaza
               New York, NY 10112


**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

Defendants move to dismiss with prejudice the consolidated amended class action complaint ("Complaint") in this securities fraud action for alleged violations of the Securities Exchange Act of 1934; § 10(b) ("10(b)"), § 20(a) ("20(a)"), and Rule 10b-5 ("10b-5") promulgated thereunder.[1]  For the reasons discussed below, the Complaint is dismissed without prejudice.

## Background

Many of the allegations in the Complaint are supported by the recollections and opinions of six confidential witnesses ("CW"s), all of whom were employees or agents of Universal or its subsidiaries at all relevant times. (Compl. ¶ 21.)  The action is brought on behalf of those who purchased the securities of defendant Universal American Financial Corporation ("Universal") between February 16, 2005 and October 28, 2005 (the "Class Period").  Plaintiffs allege that Universal, a health and life insurance company, issued false and

---

[1] In its May 1, 2006 Memorandum Opinion and Order, the Court consolidated the above-captioned case with Western Washington v. Universal.  Pursuant to Federal Rule of Civil Procedure 42(a), the Court appointed Western Washington Laborers-Employers Pension Trust ("Western Washington") as lead plaintiff, and approved Western Washington's selection of Samuel H. Rudman and David A. Rosenfeld of the law firm Lerach Coughlin as lead counsel.  Subsequently, on June 26, 2006, Western Washington filed the consolidated amended class action complaint that is the subject of this motion to dismiss.  A third related case, Green Meadows v. Universal, a shareholder derivative action, is not part of this consolidated action.

misleading statements regarding the financial performance of its senior citizen health care segment ("Senior Segment") as part of a scheme to allow insiders to sell their privately held shares while the shares were artificially inflated.

Notably, Plaintiffs do not allege that any of the reported financial results for the company were false.  Rather, Plaintiffs allege that Defendants' statements accompanying financial reports painted an overly optimistic and misleading portrait of the Senior Segment.  As a result of this alleged scheme, Plaintiffs purchased inflated common stock that dropped in value after the company announced a decline in net income on October 28, 2005.

The Complaint contains three counts.  Count I is brought against Defendants Universal, Barasch, Waegelein, and Bryant for violations of 10(b) and 10b-5.  Count II is brought against Defendant Wehner for violations of 10(b) and 10b-5(c).  Count III is brought against all of the individual defendants for violations of 20(a).

## A.   __The Defendants__

Defendant Universal and its subsidiaries sell insurance in the United States and Canada.  Universal primarily sells Medicare Supplement,[2] Medicare Advantage,[3] fixed benefit accident and sickness

---

[2] Medicare Supplement is a voluntary private insurance policy that generally covers Medicare co-payments and other services. (Compl. ¶ 29.)

[3] Medicare Advantage is a health plan offered by private companies through Medicare, which provides both basic Medicare benefits and those offered through Medicare Supplement. (Compl. ¶

3

disability insurance, senior life insurance, and fixed annuities. (Compl. ¶¶ 7, 28.)

Universal monitored its medical loss ratio ("MLR") at all relevant times to gauge the strength of its business.  MLR measures the ratio of a company's collected premiums versus the expenses it incurs in providing health care.  An increase in this ratio indicates that the company is growing less profitable. (Compl. ¶ 33.) Universal also monitored its level of Lapsation (non-payment of premiums by policyholders) and Rollover (sales agents transferring business to competitors). (Compl. ¶ 34.)

During all relevant times, Defendant Richard A. Barasch ("Barasch") was Universal's Chairman, President, and Chief Executive Officer ("CEO").  Defendant Robert A Waegelein ("Waegelein") was Universal's Executive Vice President and Chief Financial Officer ("CFO").  Defendant Gary W. Bryant ("Bryant") was Universal's Executive Vice President and Chief Operating Officer ("COO"). Defendant William E. Wehner ("Wehner") was director and President of Pennsylvania Life Insurance Company, a subsidiary of Universal. (Compl. ¶ 8.)

During the Class Period, Barasch "sold 160,000 shares of his personally-owned stock at artificially inflated prices, for gross proceeds of $3.24 million."  Waegelein "sold 60,000 shares of his personally-owned stock at artificially inflated prices, for gross

_____

30.)

4

proceeds of $1.37 million."  Bryant "sold 120,000 shares of his personally-owned stock at artificially inflated prices, for gross proceeds of $2.74 million."  Wehner "sold 150,000 shares of his personally-owned stock at artificially inflated prices, for gross proceeds of $2.63 million." (Compl. ¶¶ 8, 96.)

According to the Complaint, these sales were made while each Defendant was in possession of private material adverse information "which they knew would negatively impact Universal stock once it was made public." (Compl. ¶ 96.)  The sales were also allegedly unusual compared to Defendants' sales prior to the Class Period and represented a "significant portion" of each Defendant's holdings. (Compl. ¶ 96.)

**B.  Chronology of Events**

    **1.  February through March 2005**

The Class Period begins on February 16, 2005, the day Universal issued a press release announcing "record" financial results for its fourth quarter ended December 31, 2004 and year end 2004.  The press release reported net income of $17.4 million, earnings of $.30 per diluted share, and total revenue of $206.6 million.  Plaintiffs do not allege that these reported financial results were false. Instead, Plaintiffs take issue with Defendant Barasch's comments in the report regarding Universal's Senior Segment:

> We are especially pleased with our improved strategic
> position in the senior health insurance market. . . .
> As this market for individual senior health insurance

grows, our company is well-positioned to offer the full
range of needed products.
. . . .
The Senior Solutions program is a key part of our
efforts to increase senior market sales.  We continue
to emphasize recruiting and new office expansion, and
we have begun to see the results in new sales.
. . . .
For the full year, the loss ratio on our Medicare
supplement business increased by 80 basis points to
69.1% from 68.3 percent in 2003 and segment income was
1% lower than last year.  We have already begun to
apply for and implement rate increases that should
allow us to reverse this trend.

(Compl. ¶ 47.)  According to the Complaint, these statements were

misleading because Defendants did not disclose that rate increases

would be higher than expected and that the rate increases would hurt

rather than help the company.

To support these allegations, the Complaint relies on

Universal's application with the Department of Insurance in states in

which it conducted business for a rate increase in its Medicare

Business.  These applications were made some time in early 2005, no

later than April 2005.  The applications, according to the Complaint,

were not readily available to the public.  Universal allegedly

detailed in the applications "the condition of its business in an

effort to justify the requested rate increase." (Compl. ¶ 36.)

Plaintiffs assert that the condition of the business detailed in the

applications was materially different from the condition of the

business disclosed to the public.

Plaintiffs also rely on the opinions of the CWs to demonstrate

the alleged falsity of Defendants' statement about the magnitude of

the rate increases sought.  In CW-1's opinion, "[Universal knew the that the loss ratio was going to go way up because of [the rate increase] -- they're not stupid."[4]  (Compl. ¶ 38a.)  According to CW-6, "universal executives, including Defendant Wehner, knew that the significant rate increase . . . would create a huge gap between Universal's premiums and those of the Company's competitors and, in effect, cause sizeable Lapsation, Rollover and loss of overall business." (Compl. ¶ 39c.)

CW-1 had attended a meeting led by Universal executives, including Defendants Barasch, Bryant, and Wehner, from January 8, 2005 through January 21, 2005 in Florida ("January 2005 Meeting"). (Compl. ¶ 38a.)  At the meeting, CW-1 recalls being told, though it is not clear by whom, "that despite the Company's rate increase only three weeks earlier on January 1, 2005, there were already plans to implement further rate increases during 2005."  CW-1 also recalls Universal's chief actuary saying "they were going to have a big rate increase."  CW-1 was told, though again it is not clear by whom, that these changes were being made because Universal's "loss ratio is so terrible."  At this meeting, according to CW-1, the Company's sales managers were shown a PowerPoint presentation in which "the Company's MLR was significantly higher than the MLR disclosed to the public in the Company's financial reports." (Compl. ¶ 38a.)

---

[4] Also in CW-1's opinion, "it's real obvious to me -- they artificially inflated the stock price over the short term . . ." (Compl. ¶ 45).

CW-2 also attended a meeting in Florida in early 2005, though it is not clear whether it was the January 2005 meeting attended by CW-1.  At this meeting, "senior management told 'us that the claims losses were just horrendous' and that 'the claims losses were higher -- we're going to have big rate increases.'" (Compl. ¶ 38b.)

The day after the press release was issued, on February 17, 2005, Universal held a conference call with investors and analysts. On the call, Defendant Barasch stated as follows:

> As [the senior] market grows and as more individuals within this demographic segment need to acquire some sort of health insurance coverage, our Company is an [sic] position to offer the products that are needed whether on the indemnity side or the managed care side.
> . . . .
> We're very optimistic about our ability to keep growing the senior health insurance business through our career agents. . . . As these new [22 Senior Solutions] offices take root, we expect that this branding of our product line will lead to better recruiting and higher sales in the near term.
> . . . .
> [O]ur senior market brokered segment was somewhat disappointing this quarter as a result of higher than expected Med-Sup loss ratios.  For the full year loss ratio in our Med-Sup asset business increased by 80 basis points to 69.1 percent up from 68.3 percent last year and consequently segment income was 1 percent lower than last year.  We've already begun to apply for and implement rate increases that should allow us to reverse this trend through the course of 2005.
> . . . .
> We're confident that this positive trend in new sales activity in the Medicare Advantage segment will continue.
> . . . .
> But even with increases competition we think we are well-positioned to continue our pattern of growth.
> . . . .
> With our existing strength in Medigap, our growing presence in the Medicare Advantage market . . . , we

> think we are in an excellent strategic position to
> benefit from the enormous opportunities that exist in
> the senior health insurance market.
> . . . .
> [W]e anticipate earnings for 2005 in the range of $1.17
> to $1.24 per diluted share excluding realized gains. .
> . . Keep in mind that Medicare supplemental loss ratios
> are higher in the first quarter as policyholders
> satisfy their Medicare deductibles and then the loss
> ratios trend lower through the balance of the year.

(Compl. ¶ 49.)

The conference call included a question and answer session in which Jason Zucker, an analyst at Fox-Pitt, asked Defendant Barasch, "Can you talk about price increases that you've been getting on average . . . ?" Barasch answered, "we think they're going to be 8 or 9 -- between 8 and 10 percent going forward." (Compl. ¶ 51.)

Barasch's general characterization of the Senior Segment's current and future prospects was allegedly false and/or misleading, as was his predicted rate increase range. Barasch allegedly knew that Universal's Senior Segment was not healthy, that earnings-per-share would be lower than predicted, and that the rate increases would be higher than predicted. In CW-1's opinion, Defendants "would have known the negative impact that increasing rates would have on the Company's performance as rate increases would make it more difficult for the Company's agents to sell Universal's policies," which "would, in turn, lead to increased Lapsation and Rollover." (Compl. ¶ 39a.) In CW-5's opinion, "the market is competitive and people are inclined to move when the price increases." (Compl. ¶ 38c.)

9

As of the February 2005 press release, Universal stock was trading at approximately $16 per share.[5]  On March 1, 2005. Universal's stock dipped down below $16 and was trading at approximately $15.83 per share.  On this date, an "[i]nsider s[old] 20,000 shares for $316,552." (Compl. ¶ 46.)

On March 16, 2005, Universal filed a 10-K with the Securities and Exchange Commission ("SEC"), which reiterated Universal's financial results for the fourth quarter and year ended December 31, 2004.  The report stated that Universal routinely monitored its MLR to ensure compliance with loss ratio standards required by state law, that the company requested rate increases when needed, that the company believed its prices, products, and customer service were competitive, and that Universal management "has not identified any material weaknesses in our internal control over financial reporting." (Compl. ¶ 53.)  The 10-K was accompanied by certifications by Barasch and Waegelein, attesting to the accuracy and completeness of the reports. (Compl. ¶ 55.)  This information was allegedly false and misleading because Barasch and Waegelein knew the reports were not complete or accurate.

Between April 1, 2005 and May 2, 2005, Universal's stock price

---

[5] The Court makes this approximation based on the chart included in the Complaint.  The line on the chart associated with January 2005, appears to intersect the vertical axis halfway between the $14 mark and the $16 mark. (Compl. ¶ 46.)  Unless stated otherwise, approximations of stock price made in this decision are based on the Court's reading of this chart.

fluctuated between approximately $16 and $18 per share.  During this period, "Insiders s[old] 190,000 shares for $3,310,776." (Compl. ¶ 46.)

### 2.  <u>May 2005</u>

On May 3, 2005, Universal issued a press release announcing "record" financial results for its first quarter ended March 31, 2005.  The company reported net income of $16.1 million, earnings per diluted share of $.28, and total revenues of $224.3 million.  Again, Plaintiffs do not challenge the reported financial results, but instead take issue with Defendant Barasch's comments in the report about the Senior Segment:

> Led by outstanding results in our Medicare Advantage segment, we are very enthusiastic about our strategic position in the senior health insurance market.  To complement our Medicare supplement franchise, we are now building a Medicare Advantage business as well.  As the market for individual senior health insurance grows, our company is well-positioned to offer the full range of needed products.
> . . . .
> [R]esults in our Senior Market Health segment were negatively impacted by higher morbidity, primarily from the increase in the deductible for Part B coverage.  Our Medicare supplement loss ratio increased 140 basis points . . . , leading to a 14% decrease in segment income for the quarter.  We have already applied for and will implement rate increases that should allow us to reverse this trend.  As we have discussed previously, first quarter results in the Medicare supplement business are impacted by loss ratios that are seasonal and predictably higher than in the succeeding quarters, and we expect to see improvement throughout the balance of the year.
>
> Our senior market sales force continues to perform well.

(Compl. ¶ 57.)

During a conference call with investors and analysts the next day, Barasch essentially repeated what was stated in the report. (Compl. ¶ 59.)  The results were again repeated in Universal's 10-Q, filed with the SEC on May 10, 2005. (Compl. ¶ 61)  The 10-Q was accompanied by certifications from Barasch and Waegelein attesting to the accuracy and completeness of the reports. (Compl. ¶ 63.)  Plaintiffs allege that these statements were false or misleading because Barasch knew the MLR was affected by factors other than seasonality and because he knew the sales force was not performing well.

At some time in May 2005, CW-6 recalls "[w]e asked how can it be so bad when the stock is doing so well and [Wehner] said well, it hasn't gotten out to the stock yet and it's our job to keep the stock looking as good as it can as long as possible."  According to CW-6, "[t]his was a direct quote from Bill Wehner who was the president of the company." (Compl. ¶ 43.)  At some other point in time, not made clear in the Complaint, CW-6 recalls Wehner saying "why we're selling it is none of your business and yes, business is bad, so yes, of course, [shares are] going to go South." (Compl. ¶ 44.)

Between May 3, 2005 and June 1, 2005, Universal's stock fluctuated between approximately $17 and $19.5.  On June 1, 2005, an "Insider s[old] 20,000 shares for $378,200"; for presumably $18.91 per share. (Compl.

3.  **June 2005**

On June 6, 2005, Universal issued a press release announcing that it had launched a secondary offering of 7,000,000 shares of common stock, 2,000,000 of which were being offered by Universal and 5,000,000 of which were being offered by Universal's largest shareholder, Capital Z Financial Services Fund II, L.P. (Compl. ¶ 65).  On June 17, 2005, Universal issued a press release announcing the price of the secondary offering –- $23.61 per share.

On or about June 17, 2005, Universal filed a prospectus with the SEC.  The prospectus said that Universal had "quality customer service," and included the following statements:

> We also believe that our policies and premium rates, as well as the commissions paid to our sales agents, are generally competitive with those offered by other companies selling similar types of products in the same jurisdiction.  In addition, our insurance subsidiaries operate at lower policy acquisition and administrative expense levels than some other insurance companies, allowing us to offer competitive rates while maintaining underwriting margins.

(Compl. ¶ 67.)  These statements were allegedly made when Defendants knew Universal's customer service was poor and the company was not competitive.  To support this allegation, CW-1 states: "Of course, you get what you pay for, so the service went way down.  We used to be able to justify the prices that Pyramid charged because of excellent service but when [Universal] bought them, they just ruined the service." (Compl. ¶ 41)

Universal stock rose from approximately $18.91 per share on June

1, 2005 to about $24 per share on June 17, 2005, the date of the
secondary offering.  From June 17, 2005 until July 1, 2005, the stock
price fluctuated and went down to about $22.7 per share; at which
point an "Insider s[old] 20,000 shares for $454,000." (Compl. ¶ 46.)
Thereafter the stock price rose to about $24.8 per share on August 1,
2005.  On August 1, an "Insider s[old] 20,000 shares for $496,000."
(Compl. ¶ 46.)

**4.  <u>August 2005</u>**

On August 2, 2005, Universal issued a press release announcing
"record" financial results for its second quarter ended June 30,
2005.  Universal reported net income of $18.7 million, earnings per
diluted share of $.32, and total revenues of $229.6 million.  Once
again, Plaintiffs do not allege that the financial results were in
any way false, but allege instead that Barasch's comments about the
Senior Segment accompanying the report were false or misleading:

> We . . . continue to be enthusiastic about our
> strategic position in the senior health insurance
> market . . . . As the market for individual senior
> health insurance grows, our company is well-positioned
> to offer the full range of needed products.
> . . . .
> In line with recent trends, our Medicare supplement
> loss ratio increased 200 basis points to 71.8% from
> 69.8% in the second quarter last year, in part as a
> result of the increase in the Part B deductibles.  We
> continue to implement rate increases that, along with
> expected seasonal reductions in loss ratios, should
> result in more favorable results through the balance of
> the year . . .
>
> Our senior market sales force continues to perform
> well.  Even with lower Medicare Supplement sales,
> overall sales by our independent and career agents,

including the sale of Medicare Advantage products,
increased by 33% as compared to the second quarter of
2004.

(Compl. ¶ 69.)  Plaintiffs allege that Barasch made these comments
while in possession of contrary information; specifically, that
Universal was not optimistic about the Senior Segment, that factors
other than seasonality would affect the MLR, and that the sales force
was not performing well.  CW-5 stated that company employees warned
Universal executives, including Barasch, that rate increases would
lead to Lapsation, (Compl. ¶ 38c); in other words that the rate
increases would not fix the MLR but would make it worse.

On a conference call the following day, Barasch continued to
express optimism about the company's ability to compete in the
future, predicted a lower MLR as deductibles were satisfied, provided
earnings guidance for 2005 of between $1.13 to $1.17 per share, and
predicted earnings per diluted share of $.29 to $.31 . (Compl. ¶ 71.)
When asked on the call about the MLR, Barasch stated that,

> [I]t is very hard to pin the medical loss ratio to a
> number because we do –- we're in the health insurance
> business and the numbers move.  We're starting to see a
> pattern developing, somewhere between 71.5 and 72.5,
> sort of on a consistent basis.  I think that is a
> reasonable band to think about, although, it's likely
> that over time it will go to the higher part of that
> band.

(Compl. ¶ 73.)  Barasch commented further when asked about the
seasonality of the MLR,

> It's associated with several factors.  That's one.  And
> second is that we're growing pretty rapidly and one of
> the hallmarks of our organization is the ability pretty

15

quickly to determine where people fit in the risk
adjuster categories. . . . [I]f the new business we're
bringing on is healthier, our price per month will go
down a little bit.  Or it's sicker, it's going to go up
a little bit.  So we're going to see some cyclicality.
. . . [S]easonality is the wrong way of looking at it.
It is not going to be a straight line.  We're going to
see some movement in those numbers as our book of
business changes.

(Compl. ¶ 73.)

Universal repeated the financial results issued in the press
release in its 10-Q filed with the SEC on August 9, 2005.  The 10-Q
was accompanied by certifications from Barasch and Waegelein,
attesting to the accuracy and completeness of the report. (Compl. ¶
77.)

From August 2, 2005 through October 3, 3005, the price of
Universal stock fluctuated between approximately $25 per share and
just under $22 per share.  Between September 1, 2005 and October 3,
2005, "Insiders s[old] 220,000 shares for $5,023,812." (Compl. ¶
46.)

### 5.  <u>October 2005 through February 2006: The "Truth" is Revealed</u>

On October 28, 2005, Universal issued a press release for its
third quarter ended September 30, 2005, announcing financial results
that were lower than predicted.  For the quarter, Universal reported
net income of $15.3 million, or $.25 per diluted share, and total
revenues of $237 million.  Though total revenues increased by
approximately $7.4 million from the previous quarter, the earnings
per diluted share were lower than the $.29 to $.31 range Barasch had

predicted to investors.  Universal also announced that profits from
Medicare Supplement decreased 33% and the Medicare Supplement loss
ratio for the third quarter was 71.9%, approximately 290 basis
points higher than predicted.  The report stated that Universal had
experienced higher Lapsation because of the departure of three
managers.  The report disclosed that Universal would be revising its
guidance for 2005.  Plaintiffs quote from, what they consider, the
pertinent part of the report:

> Universal American's third quarter 2005 earnings were
> affected by:
>
> - Higher-than-anticipated loss ratio in the
>   Medicare Supplement business that reduced
>   anticipated earnings by $0.03 per share;
>
> - Increased Lapsation in the Medicare
>   Supplement business, which resulted in an
>   accelerated write-down of certain non-cash
>   deferred acquisition costs that reduced
>   anticipated earnings by $0.03 per share; and
>
> - $0.9 million in additional expenses incurred
>   in implementing the Company's Medicare Part D
>   growth initiatives that reduced anticipated
>   earnings by approximately $0.01 per share.
>
> . . . .
>
> We continue to address the loss ratio in our Medicare
> Supplement business by obtaining appropriate rate
> increases, and we believe this business will continue
> to be a valuable, long-term earnings contributor.

Defendants held a conference call with analysts later
that day to discuss the press release.  During the call,
Defendant Barasch repeated much of the information contained
in the press release.  He also provided two explanations for

17

the higher loss ratio for Medicare Supplement: (1) "more doctors are seeing more people in our book of business," and (2) due to the increase in skilled nursing facilities a "little bit of cost-shifting in the hospitals from in-patient to out-patient." (Compl. ¶ 81.)  Barasch also predicted that the loss ratio would improve by late 2006 or early 2007.

On October 28, 2005, after the announcement, the company's share prices dropped by 33%, or $7.50 a share. (Compl. ¶ 46.)

Though the Class Period ended in October 2005, Plaintiffs quote from a conference call held several months later, on February 13, 2006, during which, "Defendant Barasch disclosed the true reasons behind the increase in the Company's Lapsation." (Compl. ¶ 83.)  Barasch stated, as follows:

> We believe that there are a number of factors contributing to the Lapsation, including competitive pressure from other MedSup companies and from Medicare Advantage products, as well as the departure of certain of our sales managers.

(Compl. ¶ 83.)

## C.   **The Motion to Dismiss**

Defendants move to dismiss, arguing the Complaint does not meet the heightened pleading standards for securities fraud, and that most of the alleged misstatements or omissions identified in the Complaint are either immaterial or otherwise protected by the "bespeaks caution" doctrine and the PSLRA's safe harbor provisions. Defendants assert that Plaintiffs fail to plead sufficient facts to

support an inference of scienter, and that the Complaint does not adequately plead loss causation.

## Discussion

### A.  Motion to Dismiss Standard

#### 1.  General Motion to Dismiss Standard -- Rule 12(b)(6)

On a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted, the court must accept the factual allegations of the complaint as true. Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996).  The Court, however, is not required to accept as true conclusory allegations or "a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286, (1986).  The issue on a 12(b)(6) motion to dismiss is not whether the plaintiff will ultimately prevail, but whether he or she is entitled to offer evidence to support the claim. Id.  A court should "read the complaint generously and draw reasonable inferences in favor of the pleader." Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989).

#### 2.  Heightened Pleading Standard for Fraud -- Rule 9(b)

Because the Complaint alleges fraud, Plaintiffs are required to go further than 12(b)(6) and comply with the heightened pleading standards of Fed. R. Civ. P. 9(b).  The text of 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

Rule 9(b) is applied "assiduously" in the Second Circuit to cases, such as the one at bar, involving securities fraud. Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 168 (2d Cir. 2005).  To comply with 9(b) in such cases, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (internal quotations omitted).  Dismissal under 9(b) is usually without prejudice. Luce v. Edelstein, 802 F.2d 49, 56-57 (2d Cir. 1986).

### 3.  **Heightened Pleading Standard for Securities Fraud -- PSLRA**

Because this is a securities fraud action, an area of law historically prone to litigation abuse, the Complaint must also comply with the PSLRA, 15 U.S.C. § 78u-4.  Congress enacted the PSLRA to weed out frivolous lawsuits brought by unlucky or unwise investors looking for someone to blame.  The PSLRA set forth stringent pleading standards for securities fraud actions that essentially codified 9(b). Lentell, 396 F.3d at 168.

The PSLRA requires that in all actions alleging misleading statements or omissions,

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).  The complaint must also "state with

particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2).

Guided by these standards, the Court turns to an evaluation of the Complaint.

## B.  Examining the Complaint

### 1.  Count I:  10(b) and 10b-5 claims

#### a.  Legal Standard

Section 10(b) provides that,

> It shall be unlawful for any person, directly or indirectly
> . . . to use or employ, in connection with the purchase or
> sale of any security . . . any manipulative or deceptive
> device or contrivance in contravention of such rules and
> regulations as the Commission may prescribe as necessary and
> appropriate in the public interest for the protection of
> investors.

15 U.S.C. § 78j(b).

Under this statutory authority, the SEC promulgated Rule 10b-5, which makes it unlawful

> (a) To employ any device, scheme, or artifice to
> defraud,
>
> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made, in the light of the
> circumstances under which they were made, not
> misleading, or
>
> (c) To engage in any act, practice, or course of
> business which operated or would operate as a fraud or
> deceit upon any person, in connection with the purchase
> of any security.

17 C.F.R. § 240.10b-5.  Count I relies only on 10b-5(b), as it

alleges only untrue statements or omissions with regard to the applicable defendants and not a scheme to defraud.[6]

To state a claim under 10(b) and 10b-5(b), a plaintiff must plead that the defendant (i) made a false statement or omitted a material fact, (ii) acting with scienter, and (iii) that the plaintiff relied on defendant's statement to its detriment. San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Companies, 75 F.3d 801, 808 (2d Cir. 1996).

### i.   **False Statement or Omission of Material Fact**

To be actionable, a statement must be materially misleading. Information is material if there exists a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." In re Northern Telecom Ltd. Sec. Litig., 116 F. Supp.2d 446, 465 (S.D.N.Y. 2000).

To survive the motion to dismiss, "plaintiffs must do more than say that the statements . . . were false and misleading; they must demonstrate with specificity why and how that is so." Rombach, 355 F.3d at 174.  The Second Circuit has mandated that "[w]here

---

[6] To the extent Plaintiffs intended to base any of the allegations made under Count I on 10b-5(a) or (c), such allegations lack merit. See Lentell v. Merrill Lynch, 396 F.3d 161, 177 (2d Cir. 2005) ("We hold that where the sole basis for such claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c).").

plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." <u>Novak</u>, 216 F.3d at 309.

Forward-looking statements are not actionable if they fall within the "safe harbor" of the PSLRA, 15 U.S.C. § 78u-5(c). <u>In re QLT Inc. Sec. Litig.</u>, 312 F. Supp.2d 526, 532 (S.D.N.Y. 2004) (Stein, J.).  Three categories of statutory safe harbors exist under the PSLRA.  The first protects forward-looking statements when they are identified as forward-looking and "accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i).  This safe harbor is complemented by the judicially-created "bespeaks caution" doctrine, under which "'alleged misrepresentations are immaterial as a matter of law [if] it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language . . .'" <u>QLT</u>, 312 F. Supp.2d at 532 (citing <u>Rombach</u>, 355 F.3d at 173 (quoting <u>Halperin v. eBanker USA.com, Inc.</u>, 295 F.3d 352, 357 (2d Cir. 2002))).

To determine whether cautionary language is adequate, courts first identify the allegedly undisclosed risk.  Second, courts read the allegedly misleading materials and the cautionary language together to determine whether "a reasonable investor could have been misled into thinking that the risk that materialized and

resulted in his loss did not actually exist." Halperin, 295 F.3d at 359.  The cautionary information need not be in the same document that contains the forward-looking statement, but must instead be reasonably available to investors and affect the total mix of information. Id. at 357.

The second statutory safe harbor protects forward-looking statements when they are immaterial. 15 U.S.C. § 78u-5(c)(1)(A)(ii).  Mere puffery or generalized expressions of optimism are immaterial as a matter of law. See Rombach, 355 F.3d at 174 ("People in charge of an enterprise are not required to take a gloomy, fearful or defeatist view of the future; subject to what current data indicates, they can be expected to be confident about their stewardship and the prospects of the business that they manage.") (internal quotations omitted).  Judge Sidney Stein provides some examples of non-actionable generic statements of optimism in QLT, 312 F. Supp.2d at 533:

> Galbraith's August 1, 2000 statement that QLT's results
> from the second quarter of 2000 "is [not] going to be a
> one-quarter blip" and Levy's expression of confidence
> on October 11, 2000 in "Ciba Vision's ability to
> continue strong growth in sales in the U.S." are
> clearly expressions of the corporate stewards'
> optimistic opinions.

The third safe harbor protects forward-looking statements unless the plaintiff can prove that the statement "was made with actual knowledge by that person that the statement was false or misleading." 15 U.S.C. § 78u-5(c)(1)(B).  Plaintiffs cannot prove

actual knowledge by alleging that the projections ultimately proved erroneous. See QLT, 312 F. Supp.2d at 534.

### ii.  **Scienter**

Scienter can be shown "'by alleging facts to show that defendants had both motive and opportunity to commit fraud,'" or "'by alleging facts that constitute strong circumstantial evidence of conscious behavior or recklessness.'" QLT, 295 F.3d at 534 (quoting Novak, 216 F.3d at 307).

### iii.  **Loss Causation**

Under the PSLRA, plaintiffs "have the burden of proving that the act or omission of the defendant alleged to violate this title caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).  The concept of loss causation is similar to the concept of proximate cause in tort law: "[I]n order to establish loss causation, a plaintiff must prove that the damage suffered was a foreseeable consequence of the misrepresentation." Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1495 (2d Cir. 1992).

### b.  **Analysis**

#### i.  **False Statements or Omissions**

Plaintiffs allege that Defendants mislead investors about: (A) the effect of seasonality on the MLR; (B) the magnitude of the rate increases sought; (C) the effect of the rate increases on the MLR; (D) predicted earnings per diluted share; (E) the true MLR; and (F) the quality of Universal's customer service and sales force.  The

Court examines each category of statements below.

**(A)   <u>Seasonality and the MLR</u>**

In a February 17, 2005 conference call, Barasch stated, "Keep in mind that Medicare supplemental loss ratios are higher in the first quarter as policyholders satisfy their Medicare deductibles and then the loss ratios trend lower through the balance of the year." (Compl.¶ 49.) In the May 3, 2005 press release, Barasch commented "As we have discussed previously, first quarter results in the Medicare supplement business are impacted by loss ratios that are seasonal and predictably higher than in the succeeding quarters, and we expect to see improvement throughout the balance of the year." (Compl. ¶ 57).  Plaintiffs allege that these statements and other statements to the same affect made throughout the Class Period were misleading because Defendants knew the MLR was high and would remain high due to Lapsation and Rollover, rather than just seasonality.

However, beginning in at least March 2005, Defendants specifically warned of the risk of increased Lapsation and Rollover.  For example, in an annual report filed March 16, 2005, Defendants warned "If our actual claims experience proves to be less favorable than we assumed and we are unable to raise out premium rates, our net income may decrease," and "We may not be able to compete successfully if we cannot recruit and retain insurance agents.... We compete with other insurance companies for

26

productive insurance agents." (Ex. G at 33, 46.)   During an August

3, 2005 conference call, when asked about the seasonality of the

MLR, Barasch answered,

> [The MLR is] associated with several factors.  That's
> one.  And second is that we're growing pretty rapidly
> and one of the hallmarks of our organization is the
> ability pretty quickly to determine where people fit in
> the risk adjuster categories. . . . [I]f the new
> business we're bringing on is healthier, our price per
> month will go down a little bit.  Or it's sicker, it's
> going to go up a little bit.  So we're going to see
> some cyclicality. . . . [S]easonality is the wrong way
> of looking at it.  It is not going to be a straight
> line.  We're going to see some movement in those
> numbers as our book of business changes.

(Compl. ¶ 73.)   These statements made concurrent with or after May

2005 "bespoke caution."

     These statements are also protected by the PSLR's third safe

haven.  Recall, the third safe haven requires plaintiffs to plead

that the Defendants made statements about the seasonality of the MLR

"with actual knowledge . . . that the statement[s] w[ere] false or

misleading." 15 U.S.C. § 78u-5(c)(1)(B). Plaintiffs have not pleaded

specific facts to show that Defendants possessed information

contrary to the public statements. See QLT.  Plaintiffs have not, as

required by Rombach, 355 F.3d at 174 and Novak, 216 F.3d at 309,

specifically identified any reports or statements containing

information about the effect of Lapsation and Rollover on the MLR

other than the cautionary language disclosed by Defendants

themselves.  The fact that Universal, in its application for a rate

increase, "detailed the condition of its business in an effort to

justify the requested rate increase," (Compl. ¶ 36), provides no specificity and does not allege that Universal was in possession of any information contrary to what was being publicly disclosed about the MLR.  The mere opinions of confidential witnesses that, for example, Defendants must have known the MLR was being affected by more than seasonality, are not actionable.

### (B)  **Magnitude of Rate Increases**

Throughout the class period, beginning in the February 16, 2005 press release, Defendants announced Universal's application for rate increases: "We have already begun to apply for and implement rate increases." (Compl. ¶ 47).  The next day, Barasch provided a more specific estimate for the possible range of rate increases:  "[W]e think they're going to be 8 or 9 -- between 8 and 10 percent going forward." (Compl. ¶ 51.)  Plaintiffs allege that these statements failed to disclose that the rate increases sought were bigger than expected.

However, the Complaint does not specifically allege that Defendants sought more than a 10 percent rate increase in its state applications.  Fairly read, the Complaint merely alleges that the applications detailed the true condition of Universal's business and that the rate increases ultimately obtained were higher than expected.

Plaintiffs' allegation that Universal "had applied for a rate increase that was 40% more than the increase the market expected,"

(Compl. ¶ 37), is misleading.  Plaintiffs admitted at oral argument, held on December 13, 2006, that this figure was calculated based on the rate increases ultimately obtained, rather than the rate increases originally sought in the rate increase applications.[7]  The CWs' recollections of statements made at the January 2005 meeting regarding the possibility of "big" rate increases are too vague to be actionable and have attribution and timing issues.

### (C)  Effect of the Rate Increases on MLR

This allegation warrants little discussion.  Plaintiffs offer no statement or report to support their assertion that Defendants knew the rate increases would harm the MLR.  Plaintiffs rely solely on the opinions of the confidential informants; for example, CW-1's opinion that "[Universal knew that the loss ratio was going to go way up because of [the rate increase] -- they're not stupid," (Compl. 38a), and CW-6's conclusion that "universal executives, including Defendant Wehner, knew that the significant rate increase . . . would create a huge gap between Universal's premiums and those of the Company's competitors and, in effect, cause sizeable Lapsation, Rollover and loss of overall business," (Compl. ¶ 39c.) These statements do not come close to satisfying heightened pleading

---

[7] The Court notes that 40% is based on the lower end of the range predicted by Barasch, 8%, rather than the high end of his prediction, 10%.  It would seem more accurate for the Complaint to state that the rate increases ultimately obtained were 25% more than predicted.  (2.5 is the difference between 10, the higher end of Barasch's prediction, and 12.5, the rate increase obtained.  2.5 divided by 10 equals 25%.)

standards.

### (D)   **Predicted Earnings Per Diluted Share**

During the August 3, 2005 conference call, Barasch predicted earnings per diluted share of $.29 to $.31.  When the "truth" was revealed on October 28, 2005, Universal reported earnings per diluted share of $.25.  Plaintiffs fail to identify any report or statement containing contrary information indicating that the statement was false or misleading. See 15 U.S.C. § 78u-5(c)(1)(B); Rombach, 355 F.3d at 174; Novak, 216 F.3d at 309.  The mere fact that the projections ultimately proved erroneous does not state a claim for securities fraud. QLT, 295 F.3d at 534.

### (E)   **The True MLR**

Though not specifically alleged, the Complaint implies that Defendants falsely reported the MLR to the public.  Only CW-1's recollection that Universal sales managers were shown a PowerPoint presentation in January 2005 in which "the Company's MLR was significantly higher than the MLR disclosed to the public in the Company's financial reports," (Compl. ¶ 38a), supports this allegation.  However, the January 2005 meeting took place before the Class Period began.  If Plaintiffs mean to include misstatements made prior to February 2005, they must specifically do so and expand the Class Period.  If Plaintiffs mean to allege that the MLR was falsely stated during the Class Period and that Defendants knew the MLR was falsely reported based on the January 2005 PowerPoint

presentation, they must specifically do so.  In addition, it would be to Plaintiffs' benefit to provide more clarity regarding this presentation.  As currently drafted, 9(b) and the PSLRA have not been satisfied.

### (F)  Quality of Customer Service & Sales Force

During the Class Period, Universal stated that it had a strong sales force and good customer service.  The Court finds these statements immaterial as a matter of law. Cf. 15 U.S.C. 78u-5(c)(1)(A)(ii). If general statements made by companies touting quality customer service and a strong sales force were actionable, a never-ending tide of securities lawsuits would flood the courts. Statements such as that made by CW-1 opining, "Of course, you get what you pay for, so the service went way down. . . . [Universal] just ruined the service," (Compl. ¶ 41), cannot substitute for the specificity required by 9(b) and the PSLRA.  Plaintiffs can point to no specific report or statement indicating Universal's sales force or customer service was not performing well.

The remaining statements at issue in the Complaint about customer service and Universal's sales force are immaterial forward-looking expressions of generic optimism or puffery, protected under the second PSLRA safe harbor. 15 U.S.C. § 78u-5(c)(1)(A)(ii).  For example, Barasch's comments in the February 16, 2005 press release that "our company is well-positioned to offer the full range of needed products," (Compl. ¶ 47), Barasch's statements during the

February 17, 2005 conference call that "[w]e're very optimistic about our ability to keep growing the senior health insurance business through our career agents," (Compl. ¶ 49), Barasch's comments in the May 3, 2005 press release that "our company is well-positioned to offer the full range of needed products," (Compl. ¶ 57), and the list goes on.

### (G)   In re QLT Inc. Securities Litigation

Before moving on to the second 10(b) element, scienter, the Court observes that In re QLT Inc. Securities Litigation, 312 F. Supp.2d 526 (S.D.N.Y. 2004) is a directly on-point case.  Most of the allegations challenged by the QLT defendants in their motion to dismiss closely parallel the allegations challenged by Defendants in the case presently before this Court.  Judge Stein dismissed the Complaint in QLT with prejudice.  QLT and the case at bar are clearly distinguishable from In Re EVCI Colleges Holding Corp. Securities Litigation, No. 05 Civ. 10240, 2006 U.S. Dist. LEXIS 90630 (S.D.N.Y. December 13, 2006), a case relied upon by Plaintiffs, in which the complaint "identifie[d] more than thirty public statements made by defendants during the class period . . . [and] [e]ach statement [wa]s followed by a paragraph identifying precisely what facts defendants knew but failed to disclose when the statement was made." Id. at *18.  Such precision is simply not present in Plaintiffs' Complaint.

### ii.  **Scienter**

Given the pattern and timing of Defendants stock sales, scienter has been adequately pleaded.  Defendants' arguments on scienter ask the Court to go to the merits of the claim, which the Court may not do on a motion to dismiss.  Assuming Plaintiffs can cure the other defects set forth by the Court above, the Complaint alleges "with particularity facts giving rise to a strong inference that the defendant[s] acted with [scienter]." 15 U.S.C. § 78u-4(b)(2).

### iii.  **Loss Causation**

Plaintiffs allege that their losses occurred when Defendants revealed the "truth" on October 28, 2005.  The "truth" that was ultimately revealed was lower than predicted performance due to factors such as the departure of three managers and an increase in skilled-nursing facilities.  Plaintiffs must allege that the loss resulted from the disclosure of previously undisclosed information by Defendants, not from unexpected factors or factors that have little to do with the allegations in the Complaint.  Moreover, the "truth" states "We continue to address the loss ratio in our Medicare Supplement business by obtaining appropriate rate increases, and we believe this business will continue to be a valuable, long-term earnings contributor." (Compl. ¶ 79.) Therefore, the "truth" just reiterates what Plaintiffs allege Defendants previously lied about, namely that rate increases would help the

MLR.  The Complaint does not adequately allege loss causation.

### 2.  Count II: 10(b) and 10b-5(c)

Count II relies on subsection (c), the less commonly utilized subsection of Rule 10b-5.  Plaintiffs do not allege that Wehner made any misleading statements about Universal, but rather that he engaged in an "act, practice, or course of business" to inflate the price of Universal stock, so that he could sell his own stock at inflated prices.  This subsection contains an additional requirement not found in 10b-5(b), that the act, practice or course of conduct be undertaken "in connection with the purchase or sale of any security."

Though the precise meaning of "act, practice, or course of business" is still being worked out in the courts, the United States Supreme Court has interpreted the language to mean "market manipulation." Santa Fe Industries, Inc. v. Green, 430 U.S. 462 (1977).  "Manipulation" is "virtually a term of art when used in connection with securities markets." Ernst & Ernst, 425 U.S. at 199. It refers to practices, "such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity." Id.

Subsequent case law provides a few more examples.  In Cowen & Co. v. Merriam, 745 F. Supp. 925, 927 (S.D.N.Y. 1990) (Patterson, J.), the complaint alleged that the defendant arranged for firms to act as market makers for the subject corporation's stock in order to

34

bolster the price of the stock.  When the market softened, the defendant would buy more shares in the name of his wife and another entity in order to create an artificial demand for the stock. Id. The Court held that these acts, set forth in detail in the complaint, "clearly charge defendant . . . with an attempt at artificially affecting market activity in order to mislead investors." Id. at 929 (internal quotations omitted).

Gurary v. Winehouse, 190 F.3d 37, 41 (2d Cir. 1999) provides another similar example of the kind of conduct deemed market manipulation.  The defendant arranged for some firms to become market makers for the subject corporation's common stock. Id.  Then, he would sell the common stock short in order to drive the price down. Id.  These allegations sufficiently pleaded market manipulation.[8] Id. at 46.

In Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164 (1994), the Supreme Court clarified that 10(b), and the Federal securities laws in general, do not provide a cause of action for aiding and abetting.  Therefore, a defendant who aids and abets a 10b-5(b) violation, or any other securities violation for that matter, cannot be said to have engaged in an "act, practice, or course of business" within the meaning of 10b-

---

[8] However, the claim was dismissed for another reason: the buyer paid less for the seller's securities as a result of defendant's fraudulent acts, in which case a buyer cannot recover. Id. at 46.

5(c).  The defendant himself must have "actively engaged in a significant, material act, practice, or course of business" as a primary participant. <u>In re Enron Corp. Sec., Derivative & ERISA Litig.</u>, 235 F. Supp.2d 549 (S.D. Tex. 2002).

The Complaint in the case currently before this Court makes no allegations that support a claim of market manipulation.  The Complaint merely states that Wehner "is liable as a direct participant in the wrongdoing alleged herein by virtue of having sold material portions of Universal stock while in possession of material, adverse non-public information without disclosing such information," (Compl. ¶ 114), and that he told employees "the stock price was the primary focus of the Company's executive and that insiders -- including himself -- were selling their stock during the Class Period because they knew business was 'bad,'" (Compl. ¶ 119). Accepting these allegations as true, the fact that Wehner sold his stock while having a general sense that business was bad does not, as the relevant case law illustrates, rise to the level of market manipulation.

Aside from these isolated allegations about Wehner, the remainder of the Complaint concerns the other Defendants' misstatements of fact or omissions, making Count II look like a 10b-5(b) aiding and abetting claim dressed up as a 10b-5(c) claim. Post-<u>Central Bank</u>, the "act, practice or course of business" in a 10b-5(c) claim cannot rest on allegations of material misstatements

36

and omissions made by other defendants. The Complaint must allege
with specificity, and it does not, that Wehner himself conducted an
"act, scheme, or course of conduct" to defraud investors.[9] Count II
is dismissed.

### 3. Count III: 20(a)

Section 20(a) imposes secondary liability on "controlling
persons" for an underlying 10(b) violation by a "controlled person."
15 U.S.C. 78t(a). A 20(a) claim fails where the underlying
allegation is not properly pleaded. Moss v. Morgan Stanley, Inc.,
719 F.2d 5, 17 (2d Cir. 1983). Because, as stated above, the
underlying 10(b) and 10b-5 allegations are not properly pleaded,
Count III is also dismissed.

### Conclusion

Volumes of indiscriminate and conclusory allegations do not
substitute for the specificity the law requires. The Complaint is
dismissed without prejudice. If Plaintiffs wish to file an amended
complaint, they must do so by February 27, 2007.

**SO ORDERED.**

Dated:          New York, New York
                January /0 , 2007

                                 John F. Keenan

                                 **JOHN F. KEENAN**
                                 **United States District Judge**

---

[9] Even though 10b-5(c) is not subject to the PSLRA's
heightened pleading standards, the sub-section remains subject to
Rule 9(b). In re Initial Public Offering Sec. Litig., 241 F.
Supp.2d 281, 334 (S.D.N.Y. 2003).

37